BARROW and others, *Assignees of* PRIOR, *against* RHINE-LANDER.

Where a party produces and examines a witness before the Master, but neglects to inquire as to a particular *item* in the account, which the witness alone could explain, he cannot, afterwards, except to the report of the Master as incorrect, in regard to such item.

Where *R.*, while a confidential clerk of *P.*, took bonds and notes belonging to *P.*, and without his knowledge or permission, and which he refused to return, or give an account of, he was held answerable for the whole of the

principal interest due on the securities, without any regard to his diligence in obtaining payment, or the subsequent solvency of the makers; it appearing that the bonds and notes were good about the time they were so taken by *R.*

A person who receives bonds and notes as collateral security, for a debt, is bound to use due diligence, and if they are afterwards lost, through his negligence, by the insolvency of the makers, he is chargeable with the amount.

Where *R.* received a bond from *P.* as a collateral security for a debt, and the obligor offered to pay him the amount of the bond in land, at a certain price, as the only means of payment in his power, which *R.* refused to accept, although requested to do so by *P.*, and the obligor, afterwards, became insolvent, whereby the bond was wholly lost, *R.* was held chargeable with the amount of the value of the land so offered him in payment, and which he unreasonably refused to accept.

1818.

Barrow
v.
Rhinelander.

October 3d,
5th, 6th, and
December 7th.

PURSUANT to the decretal order entered in this cause, on the 29th of *September*, 1815, (for which, as well as the facts of the case, and the opinion of the court, see S. C. vol. 1. p. 550. 557. 559.) the master to whom the reference was made, on the 1st of *June* last, *reported* a balance of principal and interest due from the defendant to the plaintiffs, of 31,894 dollars and 52 cents; and that, in taking the account, he had *credited* the defendant with all moneys loaned by him to *Prior*, and paid on his account, by his request, and all money which *Prior* received from others, belonging to the defendant, between the 29th of *November*, 1790, and the 4th of *July*, 1801; That he had, also, credited the defendant with an allowance for wages, at the rate of 500 dollars a year, &c., and with the sums he reasonably paid for costs and charges in collecting the moneys due on the securities mentioned in the pleadings, and with the sums he paid for taxes on the shares, and on the lands in *Clinton ;* That he had ascertained that the defendant received divers sums of money from *Prior*, and also from his property and debtors, before he became a bankrupt, with which he had *charged* the defendant; and, also, that the defendant had received divers sums of money from the property and debtors of the plaintiffs, as assignees, with which he had also *charged*

1818.

BARROW
v.
RHINELANDER.

him; That he had ascertained that *Prior* had paid divers sums of money for, and on account of the defendant, with which he had charged him ; and that *Prior* sold to the defendant, goods, and that the defendant took goods out of the store of *Prior*, between the periods aforesaid, with which he had charged him ; and that the defendant took from *Prior*, before his bankruptcy, without permission, certain securities for money, with the principal sums of which he had charged the defendant; and that the defendant received certain sums of money on the securities so taken by him, with which he was charged; And that the defendant refused to deliver to *Prior*, on demand, for collection, *James Hulbert's* bond assigned to him by *Prior*, but this case was provided for in the stipulation. That he had charged the defendant with the divers sums received on the securities assigned to him by *Prior.* That the amount of the principal and interest of the securities received from *Prior*, by the defendant, and lost by his negligence, appeared in the schedule annexed to the report, and with this amount the defendant was charged. That the defendant had re-delivered to the plaintiffs the certificates for the *Inland Lock Navigation* shares. . That the lands in *Clinton* county, when they were conveyed to *Prior*, were undivided ; but had since been divided, and the defendant had a title to a share in severalty which belonged to *Prior*, which the defendant offered to re-convey, free of incumbrances. That the defendant can re-convey 44-89th parts of the *population* lands in *Pennsylvania*, and the contracts, bonds and mortgages, being his proportion, and is willing to re-convey, on being indemnified against his covenant and receipt.

*Various exceptions* were taken to the report of the Master; *six exceptions* were on the part of the defendant, which were argued in *October* last, and are sufficiently stated in the opinion of the court.

*Riggs* and *Boyd*, for the plaintiffs.

*Wells* and *T. A. Emmet*, for the defendant.

THE CHANCELLOR. 1. The first exception is, that the Master has not credited the defendant with 1,250 dollars, which he claims to be credited for, on the 1st of *May*, 1793, as the amount of money which *Prior* assumed to pay him, on account of a bond executed by *Andrew Uunderhill* to the defendant.

The evidence produced by the defendant, is the exhibit, (*M.*) being an account from 1793 to 1795, in which the defendant is charged with sundry *items*, and on the credit side is an entry in these words, under the date of the 1st of *May*, 1792, (though evidently intended for 1793,) " by *Andrew Underhill*, 'for so much I assumed to pay, 500 pounds;" at the bottom of the account, *Prior*, by a certificate under his own hand, speaks of " the settlement of the above account."

The answer of the defendant, states the 500 pounds to have been a lone to *Prior*. The answer and the books do not agree with the above account. But though there is confusion as to this charge, yet one fact must silence all criticism. The defendant, before the Master, claimed this debt of 500 pounds, as a sum assumed by *Prior* for *Underhill*. The plaintiffs examined *Prior* before the Master, but not as to this charge. He, and he only, could have explained this *item* in the settled account, if it was not correct as it there stood. By omitting to examine him on this point, the presumption is irresistible, that the account on this head was correct. The exception must be allowed.

2. 3. The second exception is, that the Master had reported that he had ascertained that the defendant took from *Prior*, before his bankruptcy, without permission, certain securities for the payment of money; and the third exception is, that the Master had ascertained that the amount

of principal and interest of certain of the securities re-
ceived from *Prior*, by the defendant, had been lost by the
negligence, default, and want of due diligence of the
defendant, in collecting or attempting to collect the same.

The Master was directed by a decretal order, to
charge the defendant with the amount due on such securi-
ties, for moneys, as were taken by the defendant from
*Prior*, before his bankruptcy, without permission; and
also, with the amount of such securities for money re-
ceived from *Prior*, by the defendant, as were lost by the
negligence, default, or want of due diligence of the de-
fendant, in collecting or attempting to collect the same.

There can be no possible objection to the reasonable-
ness of the order, and these two exceptions go to the fact,
that the Master reported that h·: had ascertained that such
occurrences had taken place. The Master was bound by
the order to make the inquiry, and to report the truth; and
if any grievance exists in the case, it can only be as to the
application of the discovery. The discovery and the re-
port would otherwise be perfectly harmless. To see the
application of the inquiry and of the facts so ascertained,
we must have recourse to the 4th and 6th exceptions.

4. The 4th exception is, that the Master had charged
the defendant, on the 16th of *September*, 1796, with 190
dollars and 4 cents, as, and for the balance due on that
day, on *Seaman & Avery's* note; and the

6. 6th exception is that the Master had charged him
with 81 dollars and 44 cents, as, and for the amount of
*David Barnum's* note, and had charged him as of the date
of the 6th of *October*, 1801.

The bill charged the defendant with a breach of trust,
inasmuch, as that having possession of the valuable papers
of *Prior*, he had, without the knowledge or consent of
*Prior*, taken several bonds and promissory notes for the
payment of money, and which had never been assigned or
delivered to him, and which he afterwards pretended to

hold as a collateral security for the payment of money. The answer to this part of the bill admits that while he was in the service of *Prior*, the bonds, notes and other valuable papers of *Prior*, were kept in an iron chest, and that he, at sundry times, took from among those papers certain securities for the payment of money, of which the notes in question were a part. But the defendant avers that they were taken with the express permission of *Prior*, and he denies that he took from among those papers any bond or note whatever belonging to *Prior*, without his previous consent or permission.

Here the parties were completely at issue upon this point of fact.

The proof in support of the charge, consists of the testimony of witnesses corroborated by circumstances.

*Edmund Prior*, the bankrupt himself, testifies, that the notes in question were taken by the defendant from his possession, without his knowledge or consent. He says, that they were never assigned, and he missed them in *March*, 1801, though, he concludes, that they were taken sometime in the year 1800. He says further, that the defendant refused to give him any account of the securities so taken.

*William Prior*, another witness, testifies, that, to his knowledge, the defendant took away a number of notes deposited in the desk of *Prior*, and that the notes were missing when the defendant left the service of *Prior*. That by the direction of *Prior*, he called on the defendant for a list of those securities, and he refused to give it; but the witness having a list of the missing notes, and mentioning them, the defendant confessed that the greater part of them were in his possession.

This positive testimony, accompanied with this refusal, outweighs the answer; especially when we consider the want of credit which the whole view of the case shows, is deservedly attached to many parts of this answer.

It is admitted, that *Prior* assigned to the defendant, se-

curities to the value of upwards of 16,000 dollars, and that these notes were not assigned, or endorsed; and why were not these notes regularly assigned, if intended to be delivered? The omission affords, of itself, a strong ground of inference, that they were taken without permission.

I am entirely satisfied with the conclusion drawn by the Master, that these notes were taken by the defendant from the possession of *Prior*, without his knowledge or consent. It being admitted, and it is indeed abundantly proved, that the makers were solvent on the 4th of *July*, 1801, so as to take the case out of the agreement of the solicitors, the defendant has made those notes his own by such a fraudulent appropriation, and he is justly chargeable with the amount of them.

If the case turned on the point of negligence, or a want of due diligence in the collection of the notes, every presumption ought, of course, to be made against the defendant. *In odium spoliatoris omnia præsumuntur.*

The testimony is decisive, that this act of spoliation caused the loss of *Barnum's* note. *Prior* testifies, that when that note fell due, (which was in the autumn of 1801,) *Barnum* called upon him to pay it, and as he had not the note in his possession, *Barnum* refused to pay it, and went away, and has since become insolvent. The defendant states in his answer, that in 1802, he frequently applied by letter to *Barnum*, for the payment of the note, and that in 1801, he made a personal demand upon *Barnum*, who refused to pay, because *Prior* had given him notice not to pay. *Barnum*, upon his examination, confirms the testimony of *Prior*, and contradicts the answer of the defendant. He has no recollection that the defendant ever applied to him personally for payment, or that *Prior* ever forbade or requested him not to pay the note to the holder. The tender by the defendant, of these *unassigned and unendorsed* notes to one of the assignees, on the 28th of

*April,* 1802, was therefore, an act perfectly, and most justly unavailing.

As to the note of *Seaman* and *Avery,* the testimony of *Prior* would lead us to conclude, that the money was lost from the want of a prosecution in due season. The letter of *Amasa Paine* to the defendant in 1804, shows that *Avery* was then dead, and died insolvent, and that nothing was to be obtained on the note, and the defendant does not appear to have made any effort towards the collection of this note, until as late as 1804. He was properly chargeable with the amount of those notes.

The 2d, 3d, 4th, and 6th exceptions are, consequently, overruled.

5. The 5th exception is, that the defendant is charged on the 18th of *December,* 1798, with 6,114 dollars, as, and for the balance due on *Samuel Beman's* bond, assigned to him by *Prior,* and which bore date on the 11th of *April,* 1795.

The bond of *Beman,* here referred to, was for 2,055 pounds, and was assigned to the defendant on the 4th of *February,* 1799, as a collateral security for the debt due from *Prior* to him.

It is in proof, by the testimony of *Beman* himself, that in the summer of 1802, *Beman,* by his agent, *M. Wheeler,* made an offer to the defendant of a tract of land in the town of *Hampton,* in the county of *Washington,* containing 1,338 acres, then worth 4 dollars an acre, towards a satisfaction of the bond, and that the defendant might take the land at a fair valuation. This offer the defendant rejected. *Wheeler,* the agent, confirms this fact, in all its essential parts, and, he says, that he further informed the defendant, that *Beman* said, he should be unable to pay the debt in any other way. It is also in proof, that *Williams* was employed by *Beman* to make the same offer, and *Williams,* who is now dead, told *Beman* he had made the offer, and that it was rejected. *Williams* had

further offered to release, as far as respected that land, the lien of a judgment which he owned, and which was against *Beman*, and bound the land, provided the defendant would accept that land in payment of the bond.—The offer, with this additional advantage, was still rejected. It is further in proof, that *Williams* applied personally, on behalf of *Beman*, to *Prior*, and offered to settle the bond, by giving the land accompanied with a release of his judgment upon it, and that *Prior*, deeming the offer liberal, consented to accept of it. *Prior* says, that he, then, with the assent of one of the assignees, proposed to the defendant, that if he would agree to the offer, and accept the land in satisfaction of the bond, the assignees would indemnify him against any loss upon a fair sale of the land. The defendant still refused, and the consequence was, that the whole of the land was sold under the judgment, and the debt due from *Beman* totally lost. It is further in proof, that in the spring of 1802, *Beman* offered to the defendant 3,000 dollars in land, and 2,000 dollars in obligations, upon the bond, and this offer was also rejected.

The point is now, whether the defendant, under the peculiar circumstances of the case, ought not to be responsible for the value of an offer which was so perversely and unconscientiously rejected, by means of which refusal, the whole debt has been lost.

I am of opinion, that the defendant was guilty of a breach of trust in the relation under which he stood to *Prior* and his assignees. He was bound to exercise a reasonable and equitable discretion, instead of which, his conduct, in this case, was tyrannical, oppressive, and unjust.

The defendant had, at the time, extravagant security for what was due him, independent of this bond. He had a mortgage on a house and lot in *New-York*, and a deed for lands in *Clinton* county, and population shares, and other personal securities, assigned or assumed, to the amount of upwards of 20,000 dollars, for a debt, not exceeding in

the whole, one fifth of the sum total of that accumulated security; and yet, with this abundant security, he would accept of nothing short of the uttermost farthing in money, for *Beman's* bond, though he was assured by the debtor, that the offer he made was the only means of payment in his power, and though he was solicited by *Prior*, and by *Prior's* assignees, in the shape of a proposition, calculated to subdue the most obstinate perverseness.

The defendant had uniformly endeavored to involve his claims upon *Prior*, and the amount of his security, in mystery and difficulty, the better to conceal the mischiefs of his avarice. He was repeatedly requested by *Prior* to make an account of his demands, and of the securities of *Prior*, which he held, and he as repeatedly refused. At one time, he said, he would not, because " there were certain circumstances attached to the business that would render it unsafe for him to render such an account *as might endanger the security of his bonds.*" For the same reason, he refused to give a list of the securities. At last, he appeared to yield to importunity, but said, that he would not be able to make out any such account, unless he had the privilege of using the books of *Prior*, and to which *Prior* assented. He then undertook to make out the account, and consumed the greater part of five months in preparing it. He repeatedly refused to make out a list of the securities of *Prior*, in his hands, until, at last, by the particular desire of *Bobert Bowne* and *Wm. Prior*, he made a partial list.

The same unreasonable and oppressive spirit, which manifested itself in this conduct, seems to have pervaded all the transactions of the defendant with *Prior*, as disclosed in this case. The defendant dealt oppressively and fraudulently with *Prior* from the beginning; and the rejection of the offers of *Beman*, pressed as they were by the most persuasive motives, was only a continuation of the abuse of trust.

1818.

BARROW
v.
RHINELANDER.

BARROW
v.
RHINELANDER.

As the defendant lost the debt of *Beman*, by his refusal to close with any offer that was made ; and as his conduct, in this respect, was a breach of duty resulting from the relation in which he stood with *Prior*, he ought to be held responsible for the value of the property so rejected and lost.

It is said, however, that *Beman* was insolvent on the 4th of *July*, 1801, and that this brings the case within the agreement of the counsel.

I should doubt very much, whether a case of this kind fell within the meaning of that stipulation. The provision was intended to meet the charge of negligence in prosecution, and to afford a test of the absolute inability of the party to pay at a given time. But here the debtor absolutely offered payment in land, and the question of solvency or insolvency, does not arise. There was no objection to the title offered by *Beman*, accompanied with the offer of the release of the judgment. The refusal of the defendant applied, to the subject offered, and not to its value or title. We must assume both of them to be as they were stated. If it were now a question as to the solvency of *Beman*, we have his testimony, that his property was sufficient, on the 4th of *July*, 1801, to pay all his debts, and that it was the subsequent forced sales of his property which rendered him insolvent. He says, that in calculating on his solvency in 1801, he did not include the partnership debts of the house of *Scott, Beman,* and *Wheeler*, because, he says, that *Scott* had made such arrangements with the creditors, that he was exonerated from the debts of the house.

It is said, again, that the bond in question was merged in a subsequent judgment bond which *Beman* gave to *Prior*, in 1797, as a trustee for several creditors, and in which judgment bond the existing debt to *Prior* was included. On this last bond a judgment was entered. But in answer to this objection, it is to be observed, that all

the parties concerned considered the defendant as having
the absolute control of the *Beman* debt, and all acted
upon that assumption. The equity of the case is not,
therefore, affected by the subsequent bond and judgment.
One bond will not extinguish another, even at law; and
whether the entry of judgment, on the second bond, would
do so at law, under the circumstances of this case, need
not be discussed. Every person that had an interest in
the transaction, the defendant, and *Beman* and *Prior*, and
the *assignees of Prior*, all considered the first bond in the
hands of the defendant, as a subsisting debt. This was
the universal understanding, and the technical objec-
tion cannot be listened to here, whatever force might be
attached to it in a court of law. *Prior* says, that the
judgment bond was taken in his store when the defendant
was with him, and he believed the defendant knew it, and
that it was only taken as a farther security. If the defend-
ant was considered by all parties as having the entire con-
trol of *Beman's* debt, by means of the first judgment,
*Prior* could not deal with *Beman*, in respect to the offer of
the lands, without the privity and consent of the defend-
ant. If he had attempted to extinguish the debt without
the knowledge of the defendant, it would have been deal-
ing treacherously with the defendant, and contrary to the
act of assignment of the original bond. This assignment
being made a long time subsequent to the judgment bond,
was an affirmance by *Prior* of the subsisting force of the
first bond. Nor could *Prior* accept of the offer of the
lands, by reason of another insuperable objection. He
was, at the time of the offer, a declared bankrupt, and his
property had been assigned to the present plaintiffs. It
was for that reason that *Prior* communicated the offer to
them, and obtained the consent of one of them, (and which
was sufficient for the defendant to act upon,) to the com-
position which was proposed.

The defendant never put his objection, to receiving the lands, upon the ground of the want of a sufficient assent on the part of the assignees of *Prior*. The presumption of a competent assent is irresistible, from the testimony of *Prior*, and from the conduct of the defendant. His conduct amounted to an admission of such consent.

The letter of *Prior* to *Beman*, in *March*, 1802, has been mentioned as evidence that the original bond was not deemed valid. But that letter cannot be permitted to affect the case. It was written in answer to a letter from *Beman*, complaining of a suit, in *Prior's* name, on the bond, and *Prior* informs him that the suit was without his knowledge, and that the defendant would not give him any satisfaction as to his affairs, and that he could not tell on what ground the bond was assigned to the defendant. Regretting that *Beman* should be in a situation so embarrassing, he suggests, whether *Beman* might not plead, in bar of the suit, the judgment bond, as being of later and higher authority. This letter was evidently written in a moment of despair, arising from a view of his injuries and misfortunes. It was on the very eve of *Prior's* bankruptcy, and the suggestion can have no effect on the uniform tenor of his acts, both prior and subsequent to that time.

Upon the whole, as the defendant obstinately refused every proposition, and kept the security to himself, until the debt was lost, I think he is not now to be heard to say, *I am not in fault, or I am not responsible for so great a waste upon the estate.* The admission of such a plea, would be giving success and security to the most aggravated and obstinate violation of the duties of a trustee, and of the plainest principles of equity and good conscience.

I shall, consequently, give effect to the most essential part of the Master's Report on this point, but shall modify it so far as to charge the defendant only with the value of the lands tendered in the summer or autumn of 1802. The value, as proved by the testimony of *Beman*, was

5,325 dollars, and that sum, as of the 1st of *September*, 1802, is to be substituted to the sum in the report of 6,114 dollars, as of the 18th of *December*, 1798.

As to the costs of the exceptions, the defendant will be entitled to costs of the exceptions taken on the part of the plaintiffs and overruled; and of the first exception, taken on his part and allowed. The plaintiffs will be entitled to the costs of the second, third, fourth, and sixth exceptions overruled, and neither party will be entitled to any costs for the fifth exception, which has been thus modified.

Decree accordingly.